UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | CR-07-51-B-W |
| | ) | |
| | ) | |
| RICHARD DAIGLE | ) | |

### SENTENCING ORDER

On September 11, 2007, Ricky Daigle entered a guilty plea to a one-count information charging him with money laundering under 18 U.S.C. § 1957(a), (b)(1).  On February 2, 2008, Mr. Daigle submitted a sentencing memorandum, raising several issues with the presentence report.  *Def.'s Sentencing Mem.* (Docket # 31) (*Def.'s Mem.*).  The Government filed its memorandum on February 15, 2008.  *Government's Mem. in Aid of Sentencing* (Docket # 32) (*Govt's Mem.*).  The Court concludes that Mr. Daigle's two convictions for operating a snowmobile under the influence should both count in his criminal history calculation, as should his conviction for violating a condition of release.  The Court finds that Mr. Daigle is not a minimal participant under U.S.S.G. § 3B1.2.  As to the constitutionality of Mr. Daigle's March 17, 2000 snowmobile conviction, while the Government has borne its burden of demonstrating the fact of conviction, Mr. Daigle has not sustained his burden of showing that the conviction was constitutionally infirm.  Finally, the Court will apply the 2007, rather than the 2005, Sentencing Guidelines.

## I.    STATEMENT OF FACTS

It is markedly unwise to act as an escrow agent for a drug dealer.  In 2004, Mr. Daigle agreed to be a straw man for Michael Pelletier, a drug dealer, in the purchase of real estate

located at Thirteen Caron Road in St. David, Maine.  Although Mr. Pelletier had contacted the real estate agent, had placed a deposit for property, had discussed the details of the transaction with an attorney, and had paid over $50,000.00 in cash the day of the purchase, the purchase and sale agreement and the deed were in Mr. Daigle's name as the buyer.

More specifically, on September 28, 2004, after agreeing to take title to certain real estate for Mr. Pelletier, Mr. Daigle met Mr. Pelletier in the parking lot of Mr. Pelletier's attorney's office, accepted a plastic shopping bag containing $50,540.00 in cash from Mr. Pelletier, and delivered the money to Mr. Pelletier's attorney, who entered the money into his client trust account.  Mr. Daigle also signed a property tax declaration for the purchase of Thirteen Caron Road, and left Mr. Pelletier's attorney's office without any further documentation.  On October 1, 2004, the real estate agent and the owner of the property went to Mr. Pelletier's attorney's office, and signed a property tax declaration form and a deed transferring ownership to Mr. Daigle; Mr. Pelletier's attorney presented them with checks drawn on his client trust account.

Later, Mr. Daigle admitted to authorities that Mr. Pelletier approached him about purchasing the real estate, and after initially refusing to participate, Mr. Daigle made the purchase for Mr. Pelletier.  *Revised Presentence Investigation Report* ¶ 2 (*PSR*); *Prosecution Version* (Docket # 24).  Mr. Daigle also admitted that he believed Mr. Pelletier was using drug proceeds to purchase the property, but denied that Mr. Pelletier ever told him about the source of the funds.  *Prosecution Version* at 3.

Mr. Daigle has three criminal convictions:  (1) an April 8, 1998 conviction for operating a snowmobile under the influence (snowmobile OUI); (2) a March 17, 2000 conviction for snowmobile OUI; and, (3) a March 10, 2006 conviction for violating a no-contact condition in his release provisions for a pending charge of assault.  The PSR gave one criminal history point

2

to each conviction, resulting in a criminal history category of II.  *PSR* at 5-6.  The PSR counted

the snowmobile OUIs under U.S.S.G. § 4A1.2, Application Note 5, which counts convictions for

driving while intoxicated.[1]  *PSR* at 14.  The PSR counted the violation of the release provision

under U.S.S.G. § 4A1.1(c), which assigns one criminal history point for each prior sentence not

already counted.  *PSR* at 6.

## II.    DISCUSSION

### A.    Criminal History Computations

#### 1.    An Overview

The Court assigns points to a defendant's past conviction(s) to determine his or her

criminal history category.  U.S.S.G. § 4A1.1.  Unless the conviction is excluded, the Guidelines

count each conviction and assign varying points based on the length of the sentence.  *Id.*  Certain

sentences for misdemeanor and petty offenses are exempted under U.S.S.G. § 4A1.2.  Mr.

Daigle's two arguments regarding criminal history both concern this section.  First, he asserts

that his two convictions for operating a snowmobile under the influence should not be counted

because they are "fish and game violations" under U.S.S.G. § 4A1.2(c)(1).  Second, he argues

that his violation of a condition of release ought not to be counted because it is similar to

contempt of court, which is not countable under U.S.S.G. § 4A1.2(c)(1).

Under First Circuit precedent, federal, not state law determines "whether an offense runs

afoul of section 4A1.2(c)(2)."  *United States v. Unger*, 915 F.2d 759, 762-63 (1st Cir. 1990).

First, "to ascertain the scope of section 4A1.2(c)(2), [the Court] should look to the substance of

the underlying state offense in order to determine whether it falls within the proscription."  *Id.* at

---

[1] Application Note 5 reads:  "Sentences for Driving While Intoxicated or Under the Influence.  Convictions for driving while intoxicated or under the influence (and similar offenses by whatever name they are known) are counted.  Such offenses are not minor traffic infractions within the meaning of § 4A1.2(c)."  U.S.S.G. § 4A1.2, Application Note 5.

763.  Then, the Court looks to the "relative danger posed by each."  *United States v. Spaulding*, 339 F.3d 20, 22 (1st Cir. 2003).

### 2.    Snowmobile OUI

#### a.    Operating a Snowmobile While Under the Influence: Mr. Daigle's Contentions

Mr. Daigle was twice convicted for the misdemeanor offense of operating a snowmobile under the influence, a violation of 12 M.R.S.A. § 10701(1-A)(c)(1) ("A person may not operate or attempt to operate a snowmobile: (1) While under the influence of intoxicating liquor or drugs or a combination of liquor and drugs . . . .").  In the state of Maine, operating a snowmobile and operating a motor vehicle under the influence of alcohol are separately criminalized.  Operating a motor vehicle under the influence is addressed under the motor vehicle laws, 29-A M.R.S.A. § 2411; operating a snowmobile under the influence of alcohol is criminalized under the laws affecting inland fisheries and wildlife via 12 M.R.S.A. § 10701.

Seizing on the location of the snowmobile OUI under title 12, the "Conservation" title, and under part 13, the "Inland Fisheries and Wildlife" part, Mr. Daigle characterizes a snowmobile OUI as a fish and game violation.  Having thus defined the offense, he points to the language in § 4A1.2(c)(2) of the Sentencing Guidelines, which provide that "by whatever name they are known," sentences for "[f]ish and game violations" are "never counted."  *Def.'s Mem.* at 2-7.  He argues that to count a snowmobile OUI as a prior conviction would contravene this provision of the Guidelines.

Mr. Daigle further argues that *Spaulding* and *Unger* are not applicable, because in contrast to situations in which 4A1.2(c) lists a specific offense, such as careless or reckless driving, "fish and game" violations "cannot be sufficiently defined to facilitate a comparison of statutory elements generally."  *Def.'s Mot.* at 3.  He asserts that a comparison shows that "the

most analogous offenses are all located in the same statutory section, 12 M.R.S.A. § 10701," and that "the statutory penalties and sentencing structures are all provided by the same authority." *Id.* at 3, 4. He goes on to contend that operating a snowmobile while under the influence is most like the "proscriptions against hunting under the influence and operating watercraft, snowmobiles and ATV's under the influence," the other violations included in 12 M.R.S.A. § 10701. *Id.* at 3. He concludes that "[o]perating a snowmobile under the influence poses similar dangers and similar risks" to "hunting under the influence." *Id.* at 4.

### b.  Discussion

The Court rejects Mr. Daigle's argument that the First Circuit analysis does not apply because the phrase "fish and game violations" does not define a crime with specific elements. Although *Spaulding* compared the committed offense of shoplifting to the excluded offense of issuing an insufficient funds check, *Unger* examined whether the committed offenses of breaking and entering, receiving stolen goods, and assault and battery constituted "juvenile status offenses" within the meaning of the Guidelines. *Spaulding*, 339 F.3d at 22-23; *Unger*, 915 F.2d at 762-64. "Juvenile status offense" is at least as ambiguous as "fish and game violations." But, more to the point, the comparison at issue here is not only with "fish and game violations," under § 4A1.2(c)(2), but also with driving under the influence under Application Note 5, which is clearly defined and countable.

*Spaulding* instructs that the first test is whether the elements of the offenses are similar. *Spaulding*, 339 F.3d at 22. As driving while intoxicated and "similar offenses by whatever name they are known" are counted under the Guidelines, the first step is to compare the elements of the countable offense with the elements of the conviction. U.S.S.G. § 4A1.2, Application Note 5. The state of Maine statutory definitions for snowmobile and motor vehicle OUI are virtually

identical.[2]  Both statutes generally prohibit attempting to operate or operating a vehicle while under the influence of intoxicants and specifically prohibit doing so with a blood alcohol level of 0.08 % or more.  *Compare* 12 M.R.S.A. § 10701, *with* 29-A M.R.S.A. § 2411; *see State v. Coburn*, 1999 ME 28, 724 A.2d 1239.  The substantial congruity of the elements of the two statutes strongly favors treating snowmobile and motor vehicle OUI as similar offenses.

Second, *Spaulding* points to the "relative danger posed by each crime" as an appropriate consideration.  *Spaulding*, 339 F.3d at 22.  Here, the dangers posed by snowmobiling and driving a motor vehicle while under the influence are remarkably similar – to passengers, fellow travelers, innocent bystanders, and the operators themselves – and the risk of catastrophic injury or death is tragically present in each.

Third, *Spaulding* lists the "risk of recidivism displayed by each crime" as relevant.  *Id.* As the escalating penalty provisions of each statute reflect, repetitive violations for either offense merit ever harsher penalties to deter future conduct.  Further, there is nothing in the record to suggest that the recidivism of an intoxicated snowmobiler is any different than that of an intoxicated driver and to conclude otherwise would run hard against common sense.

Mr. Daigle fares no better when a snowmobile OUI is compared to a fish and game violation.  Although there may be some ambiguity in the Guidelines' term "fish and game

---

[2] There is no federal statute analogous to the state OUI statutes.  However, some federal agencies prohibit operating vehicles while under the influence on their property.  Analysis of these federal OUI provisions leads to similar results.  Under National Park Service (NPS) regulations, it is illegal to operate a motor vehicle under the influence within the boundaries of a national park.  *See* 36 C.F.R. § 4.23(a); *see United States v. McFarland*, 445 F.3d 29 (1st Cir. 2006).  Pursuant to 36 C.F.R. § 2.18(a), § 4.23 is made applicable to the operation of snowmobiles.  Therefore, under NPS regulations, the same section covers both snowmobile and motor vehicle OUI.

The United States Forest Service defines vehicle broadly enough to include snowmobiles.  *See* 36 C.F.R. § 261.2 (defining vehicle as "any device in, upon, or by which any person or property is or may be transported, including any frame, chassis, or body of any motor vehicle, except devices used exclusively upon stationary rails or tracks"; defining "motor vehicle" to include a snowmobile:  "Motor vehicle means any vehicle which is self-propelled . . . ."); 36 C.F.R. § 212.1 ("over-snow vehicle" is "[a]ny motor vehicle designed for use over snow and that runs on a track or tracks and/or a ski or skis, while in use over snow.")  Regarding driving while under the influence, 36 C.F.R. § 261.15 prohibits using any vehicle off road while under the influence of alcohol.  36 C.F.R. § 261.15(e) ("It is prohibited to operate any vehicle off National Forest System, State or County roads: . . . (e) While under the influence of alcohol or other drug.").

6

violations," the phrase literally defines itself:  It must refer to breaking a law that involves either fishing or hunting.  One might use a snowmobile to arrive at a fishing or hunting spot, but operating a snowmobile itself is neither fishing nor hunting.  Further, operation of a snowmobile encompasses a wide range of activity that has nothing to do with fishing or hunting.

Mr. Daigle's real argument is that because the state of Maine places snowmobile OUI within the part of the statute that addresses some fish and game violations, such as hunting under the influence, the crime itself must be a fish and game violation.  But, this reasoning is precisely what the First Circuit emphatically rejected in *Unger*.  The Court "reject[ed] outright the idea that state law determines whether an offense runs afoul of section 4A1.2(c)(2)."  *Unger*, 915 F.2d at 762.  *Unger* explained that "[w]ere state classifications to govern the meaning of terms in the sentencing guidelines, the primary purpose of the Sentencing Reform Act, namely, to provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records, would be severely undermined."  *Id.* at 762-63 (internal punctuation and citations omitted).  To allow the state classification of snowmobiling OUI to trump the elements of the offense would be contrary to *Unger*.

Mr. Daigle's attempts to pick at nuanced contrasts between the snowmobile and motor vehicle OUI statutes are unavailing.  The Court readily concludes that none of the distinctions makes the crimes dissimilar.  First, Mr. Daigle contends that Maine law excludes snowmobiles from the definition of motor vehicle under 29-A M.R.S.A. § 101(42)(A).  This argument is a non-starter.  If Maine law did not distinguish between snowmobiles and motor vehicles for purposes of operating under the influence, there would be no argument at all.  The comparison between the two statutes means that the law treats the two differently; the question is whether the separate treatment makes the crimes similar for criminal history calculation.

7

Second, regarding the relative dangers of snowmobile and motor vehicle OUI, Mr. Daigle asserts that because the fines under the motor vehicle statute and the snowmobile statute differ, "the Maine Legislature views the risks and dangers posed by 'Motor Vehicle OUIs' as significantly greater than those posed by 'Snowmobile OUIs.'" *Def.'s Mot.* at 6-7.  It is true that there are some differences between the penalty provisions of each statute.  But, the similarities are greater than the differences.  Each statute makes a violation a Class D misdemeanor; each imposes significant mandatory minimum fines; and, each escalates the penalties if the violator has previous OUI convictions.

There are some differences.  There is a $100 difference between the penalties for a first offense ($400 for snowmobile OUI and $500 if the blood alcohol test was refused; $500 for motor vehicle OUI and $600 if the test was refused), but this difference is insubstantial.  A motor vehicle OUI mandates a ninety day suspension of the driver's license for a first offense and longer periods for repeated offenses; there is no corresponding suspension of the right to operate a snowmobile for a snowmobile OUI.[3]  *See* 29-A M.R.S.A. § 2411; 12 M.R.S.A. § 10701.

In general, a motor vehicle OUI carries with it mandatory jail terms, which escalate steeply with subsequent offenses, while a snowmobile OUI does not result in jail time for a first offense if there are no aggravating factors.  *Id.*  However, if certain enumerated factors are present, then there is a minimum incarceration of not less than forty-eight hours for a snowmobile OUI violation.  12 M.R.S.A. § 10710(3)(B)(1-3) (requiring forty-eight hour incarceration "when the person: (1) Was tested as having a blood-alcohol level of 0.15% or more; (2) Failed or refused to stop upon request or signal of an officer in uniform, pursuant to

---

[3]This difference is less significant than it might appear.  The state of Maine does not require a license to operate a snowmobile.  12 M.R.S.A. § 13102 ("An operator's license is not required for the operation of a snowmobile").  Nevertheless, while the state of Maine could prohibit a person convicted of a snowmobile OUI from operating one, it does not.

section 6953 or 10651, during the operation that resulted in prosecution for operating under the influence or with a blood-alcohol level of 0.08% or more; or (3) Failed to submit to a chemical test to determine that person's blood-alcohol level or drug concentration, requested by a law enforcement officer on the occasion that resulted in the conviction").   The snowmobile OUI statute also imposes a mandatory jail term of seven days for a second offense and thirty days for subsequent convictions.   12 M.R.S.A. § 10701(3)(B), (C).   These jail terms are not readily distinguishable from the mandatory sentences for motor vehicle OUI, which include seven days incarceration for a second offense (twelve days if aggravated) and thirty days for a third offense (forty if aggravated).   29-A M.R.S.A. § 2411(5)(B), (C).   Finally, the Court notes there is a temporal distinction dictating whether a court will apply a more stringent sentence to a subsequent offense.   Motor vehicle offenses are counted as prior offenses for ten years, while snowmobile violations are counted for six.   *See, e.g.*, 29-A M.R.S.A. § 2411(5)(B), (C); 12 M.R.S.A. § 10701(3)(B), (C).   Despite some distinctions between motor vehicle and snowmobile OUI punishments, the Court concludes that the similarities markedly outweigh the differences.

Finally, Mr. Daigle asserts that "it would defy logic to conclude that a hunting under the influence fish and game violation would not be countable but a snowmobile OUI would be countable."   *Def.'s Mot.* at 7.   Here, the Court is considering snowmobile OUI, not the other possible charges under the same statute.   How hunting under the influence would be considered under the sentencing guidelines is not before the Court.

In the alternative, the Court considers whether a snowmobile OUI is similar to motor vehicle OUI under the more limited *Taylor-Shepard-James* trilogy typically applied to determine whether a crime is a "violent felony" under the Armed Career Criminal Act, 18 U.S.C. § 924(e).[4]

---

[4] In *Spaulding*, the First Circuit stated that "[s]entencing courts are not to reexamine the evidence underlying prior convictions in deciding whether to count prior crimes toward a defendant's criminal-history score."   *Spaulding*, 339

The trilogy requires that "sentencing courts take a 'categorical approach,' which generally looks 'only to the fact of conviction and the statutory definition of the offense." *United States v. Cadieux*, 500 F.3d 37, 42 (1st Cir. 2007) (citing *Taylor v. United States,* 495 U.S. 575 (1990), *Shepard v. United States,* 544 U.S. 13 (2005), and *James v. United States,* 550 U.S. ---, 127 S. Ct. 1586 (2007)).   The First Circuit has adopted a "two-tiered categorical approach," first comparing the elements of the state and generic offenses and, only when the state definition turns out to be broader than the generic offense, *Taylor-Shepard-James* directs the Court "to examine the record of conviction to determine whether" the two crimes are similar.  *Id*. at 42-43.

This approach does not change the result, because here the Court concludes that under federal law the elements of a snowmobile OUI are virtually identical to a motor vehicle OUI. There is therefore no need to go beyond the elements of the offense to look to the record of conviction.   By contrast, the Court has already noted that snowmobile OUI does not share elements with fish and game violations under federal law.

Mr. Daigle's prior convictions for snowmobile OUI should be counted under U.S.S.G. § 4A1.2.  *See also United States v. Gentry*, 60 Fed. Appx. 206, 208-09 (10th Cir. 2003) (finding the violation of a Kansas Wildlife, Parks, and Recreation statute to be counted under the U.S.S.G. because it "was more akin to a driving under the influence violation.").

### 3.    Contempt of Court

On January 1, 2006, Mr. Daigle was on arrested and released on charges of assault.  His release was conditioned on his having no direct or indirect conduct with his girlfriend, whom he was accused of assaulting.  *Govt's Resp.* at Ex. 1 (Docket # 32-2).  Subsequently, however, Mr.

---

F.3d at 23 n.3.  The Court, however, went on to recite facts underlying Mr. Spaulding's prior conviction. *Id.* at 23. In excess of caution, the Court applies this alternative analysis relying only on the documents allowed under the narrow *Taylor-Shepard-James* trilogy, without comment as to what record may be relied upon in a U.S.S.G. § 4A1.2 analysis.  This distinction is of greater import in the subsequent section comparing a violation of conditions of release and contempt of court under § 4A1.2.

Daigle had further contact with the girlfriend, and was convicted of violation of a condition of release under 15 M.R.S.A. § 1092(1)(A). He was fined $1,000.00, received no jail time and was not placed on probation. Mr. Daigle's conviction for violating a condition of release would count under U.S.S.G. § 4A1.1(c) unless it is excluded either as an excluded offense under § 4A1.2(c) or as an offense similar to an excluded offense under that same provision. Mr. Daigle asserts that his violation of a condition of release is similar to contempt of court, which is exempt under U.S.S.G. § 4A1.2(c)(1). *Def.'s Mot.* at 8.

The Court again follows the *Spaulding-Unger* analysis. Preliminarily, this Court addressed a similar issue in *United States v. Perkins*, 421 F. Supp. 2d 209 (D. Me. 2006). In that case, Mr. Perkins argued that his violation of a protection order under Maine law should be considered similar to contempt of court under the Sentencing Guidelines. *Id.* at 211. The Court concluded that though the two crimes were similar in some respects, the relative dangers of violations of protective orders are greater than those associated with contempt of court. *Id.* at 213-15. It counted Mr. Perkins' conviction for violating a protection order in calculating his criminal history. Here, the question is slightly different: whether violating a condition of release is similar to contempt of court.

*Spaulding* requires a comparison between the elements of the two violations. Under Maine law, to violate a condition of release, a person must have been "granted preconviction or postconviction bail" and then must have violated a condition of that release. 15 M.R.S.A. § 1092(1). Section 1092(3) defines the violation of a condition of release as a strict liability crime, which under Maine law "does not include a culpable mental state element with respect to any of the elements of the crime and thus proof by the State of a culpable state of mind as to that crime is not required." 17-A M.R.S.A. § 34(4-A); *see State v. Seamen's Club*, 1997 ME 70, ¶ 11, 691

11

A.2d 1248, 1252 (noting that strict liability applies when "there is a legislative intent to impose liability without proof of a culpable state of mind").  The law provides a statutory defense of "just cause."  15 M.R.S.A. § 1092(2).

Contempt of court is federally criminalized under 18 U.S.C. § 401.[5]  It grants a federal court the "power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other as -- (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice . . . [and] (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."  18 U.S.C. § 401(1), (3).  The procedure under which an accusation of criminal contempt is heard is set forth in Rule 42.  Fed. R. Crim. P. 42.  Rule 42 permits summary disposition if the person commits criminal contempt in the court's presence.  *Id.* at R. 42(b).  Otherwise, a person charged with criminal contempt is entitled to notice, "a jury trial in any case in which federal law so provides," and if the contempt involves disrespect toward or criticism of a judge, that judge is disqualified from presiding at the contempt trial, unless the defendant consents.  *Id.* at R. 42(a)(c).  In either case, criminal contempt requires a culpable state of mind.  *See United States v. Mourad*, 289 F.3d 174, 180 (1st Cir. 2002) (stating that "[t]o convict a defendant of criminal contempt under 18 U.S.C. § 401(3), the government must prove beyond a reasonable doubt that the defendant willfully violated a lawful order of reasonable specificity"); *Gordon v. United States*, 592 F.2d 1215, 1218 n.3 (1st Cir. 1979) (stating, in a case of misbehavior under § 401(1): "Nor do we have any trouble finding adequate Mens rea to obstruct . . . ."); *United States v. Delahanty*, 488 F.2d 396, 398-99 (6th Cir, 1973); *United States v. Seale*, 461 F.2d 345, 368 (7th Cir. 1972).

---

[5] Maine law contains similar provisions regarding criminal contempt of court.  Me. R. Civ. P. 66; *see Desjardins v. Desjardins*, 2005 ME 77, ¶ 6, 876 A.2d 26, 28 (addressing contempt of court generally).

A comparison between the elements of the crimes reveals that criminal contempt and the violation of a condition of release, while having some similarities, are distinct.  To strike to the heart of the matter, the most significant difference is that criminal contempt requires a culpable state of mind, whereas the violation of a release order is a strict liability crime.

Turning to other aspects of the violation of a release order and a violation of § 401, the penalties differ.  A violation of an order of release is generally punishable as a Class E crime.[6] 15 M.R.S.A. § 1092. The federal penalty for criminal contempt is left to the discretion of the court.[7]  *Frank v. United States*, 395 U.S. 147, 149 (1969) (noting that there is no maximum penalty in prosecutions for criminal contempt); *United States v. Mallory*, 525 F. Supp. 2d 1316, 1320-21 (S.D. Fl. 2007) (concluding that criminal contempt is a Class A felony).

This leads to the second *Spaulding* consideration, the "relative danger posed by each crime." *Spaulding*, 339 F.3d at 22.  The danger from a generic violation of a release order can be various.  However, in *Spaulding*, the First Circuit reviewed the precise nature of Mr. Spaulding's violation, observing that he had made contact with his ex-wife in violation of both the protective order and the conditions of his release.  *Id.*

Here, Mr. Daigle engaged in similar conduct; he contacted his live-in girlfriend, the alleged victim of a pending assault charge, in violation of a court order.  Mr. Daigle's violation was a serious matter.  According to the PSR, on January 1, 2006, Mr. Daigle was charged with assaulting his live-in girlfriend and was released on the express condition that he not contact her.

---

[6] Section 1092(1)(B) provides that if the underlying crime was punishable by a maximum period of imprisonment of one year or more and the condition of release is one specified in section 1026, subsection 3, paragraph A, subparagraph (5), (8), (10-A) or (13), the violation is a Class C crime.  The underlying crime in Mr. Daigle's case was assault, which under Maine law is a Class D crime punishable by a maximum period of less than one year.  17-A M.R.S.A. § 207; 17-A M.R.S.A. § 1252(2)(D).  Mr. Daigle's violation of the condition of release was, therefore, a Class E crime under Maine law.

[7] Maine Rule of Civil Procedure 66(c)(2) provides that a prosecution for punitive sanctions for contempt of court is treated as a Class D crime.  Me. R. Civ. P. 66(c)(2).  Rule 66 also provides that the punitive sanction must be "proportionate to the conduct constituting the contempt." *Id.* at R. 66(c)(3).

*PSR* at 6.  In violation of that court order, Mr. Daigle contacted his girlfriend, a woman who was not merely the subject of a no-contact order, but as the alleged victim of the charge on which Mr. Daigle had been released, she was a potential witness against him. Further, the criminal charge was the equivalent to domestic assault.  His violation of this court order thus raised the risk of further altercation with the alleged victim of the pending assault charge and of improper influence of an essential witness.

Nor can the Court ignore the clearly-expressed policy of the state of Maine to protect victims of domestic assault.  *See* 19-A M.R.S.A. § 4001 ("The court shall liberally construe and apply this chapter to promote the following underlying purposes: . . . [t]o recognize domestic abuse as a serious crime against the individual and society . . . [, t]o allow family and household members who are victims of domestic abuse to obtain expeditious and effective protection against further abuse . . . [, t]o provide protection by promptly entering and diligently enforcing court orders that prohibit abuse . . . [and t]o expend the power of the justice system to respond effectively to situations of domestic abuse."); *State v. Falcone*, 2000 ME 196, ¶ 7, 760 A.2d 1046, 1048-49 (noting "the express statutory purpose of protecting the victim").

It is difficult to specify the risks attendant to contempt of court, because of the range of conduct the crime potentially includes.  The risks inherent in conduct amounting to contempt in the presence of the court are obvious and significant.  Similarly, an individual's willingness to intentionally violate a court order outside the presence of the court presents a separate set of risks.  Without minimizing the seriousness of generic contempt of court, the risks that accompany the willingness of a domestic partner to intentionally violate no-contact orders in cases of pending domestic violence are well-documented, all too frequent, and all too often tragic.

Regarding the third *Spaulding* factor – the risk of recidivism – the unifying disturbing factor in both contempt of court and violation of conditions of release is that a perpetrator necessarily has ignored or affronted the administration of justice.  *Spaulding*, 339 F.3d at 22. Whether individuals who engage in contempt of court are more likely to repeat their contumacious conduct than those who violate no-contact orders in domestic assault situations is not a matter of record and the Court cannot speculate.

Under the alternative *Taylor-Shepard-James* analysis, the Court may not rely on the facts surrounding Mr. Daigle's release violation.  This is because under the second prong of the analysis, the Court may only look to the "record of conviction, such as 'the charging document, the terms of the plea agreement or transcript of the colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or some comparable judicial record of this information.'"  *United States v. Miller*, 478 F.3d 48, 51 (1st Cir. 2007) (quoting *Shepard*, 544 U.S. at 26).  The Court has not been provided with the "record of conviction" regarding Mr. Daigle's conviction; under *Taylor-Shepard-James*, the Court may not rely upon the police reports submitted by the Government. [8]  *Shepard*, 544 U.S. at 21-22.

Limited to the categorical approach and the elements of contempt of court and violation of the conditions of release, the Court still finds that the two are not sufficiently similar to warrant applying § 4A1.2 to Mr. Daigle's prior conviction.  The Court must "consider whether *the elements of the offense* are of the type that would justify its inclusion within the residual provision, without inquiring into the specific conduct of th[e] particular offender."  *Cadieux*, 500 F.3d at 43 (quoting *James*, 550 U.S. ----, 127 S. Ct. at 1594).  As discussed above, the elements of the two crimes are distinct.  Most importantly, the *mens rea* for the two crimes is different – a

---

[8] The Government provided a document, signed by the superior court judge, describing Mr. Daigle's bail conditions on the domestic assault charge and limiting Mr. Daigle's contact with an individual.  *Gov't's Resp.* at Ex. 1. However, this document does not provide a factual basis for his conviction for violation of the conditions of release.

condition of release violation is a strict liability crime, while contempt requires a showing of culpability. *Mourad*, 289 F.3d at 180; 15 M.R.S.A. § 1092(1); 17-A M.R.S.A. § 34(4-A).  Even if the entirety of the physical acts required for conviction for the two crimes were the same, the mental state requirements establish a significant discrepancy. *Cf. Leocal v. Ashcroft*, 543 U.S. 1 (2004) (discussing the importance of *mens rea*).  Further, the fact that the Legislature does not require culpability for a violation of a condition of release evidences the seriousness with which it views such a crime.

Further, conditions of release are set specifically by a court, and then those specific conditions are violated by the person, resulting in a conviction under 15 M.R.S.A. § 1092(1).  In contrast, contempt is drawn in broad brushstrokes without always necessitating a prior court order, and can include "misbehavior" in proximity to a court.  18 U.S.C. § 401(1).  Finally, considering the circumstances of the of the two crimes, a violation of a condition of release may only occur in the context of criminal proceedings, when a person who already stands accused of a crime fails to follow the court's instructions on release; meanwhile, contempt may be applied in a variety of circumstances, both civil and criminal.

The Court concludes that a violation of a condition of release under Maine law is not similar to contempt of court under U.S.S.G. § 4A1.2(c) and, therefore, Mr. Daigle's conviction for violating a condition of release is properly counted in calculating his criminal history under U.S.S.G. § 4A1.1(c).[9]

---

[9] The Court recognizes its conclusion is inconsistent with an oral decision by Judge Hornby of this District in *United States v. Driggers*, Docket No. 04-09-P-H (June 25, 2004) in which he concluded that a violation of conditions of release was similar to contempt of court, since they both involved disobedience of a court's lawful order.  *See Perkins*, 421 F. Supp. 2d at 212.  The Court does not lightly differ from the considered judgment of its highly respected colleague.  But, having issued *Perkins*, it concludes the wiser course is to maintain its own consistency.

### B.    Plea Agreement & Guideline Applicability

Mr. Daigle argues that the 2007 Guidelines should apply instead of the 2005 guidelines, as the plea agreement recommends.  *Plea Agreement* ¶ 3(A) (Docket # 25).  The Government does not object to the use of the more recent Guidelines.  *Govt's Mem.* at 1 n.1.  Application of the 2007 Guidelines Manual is consistent with the 2005 version of § 1B1.11, which states that "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced." U.S.S.G. § 1B1.11 (2005).  In view of the parties' agreement and § 1B1.11, the Court will apply the 2007 Guidelines.

### C.    Minimal Participant

Section 3B1.2 provides that if the defendant was a minimal participant in the offense, the offense level is reduced 4 levels and if he was a minor participant, the level is reduced 2 levels. U.S.S.G. § 3B1.2.  The guidelines allow for a 3 level reduction for cases that fall in between minor and minimal participation.  *Id.*  Concluding that Mr. Daigle's role in the offense fell between that of a minor and minimal participant, the PSR allotted Mr. Daigle a three-level reduction for his role in the offense.  *PSR* at 4.  Mr. Daigle argues that he was a minimal participant in the activity for which he is convicted – money laundering – and that he should receive a 4 level reduction under U.S.S.G. § 3B1.2.

The relevant application note states that the minimal participant designation "is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group.  Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant."  *Id.* § 3B1.2, Application Note 4.  The note also emphasizes that the adjustment will be "used infrequently."  *Id.*

17

Mr. Daigle cites several cases applying § 3B1.2, particularly in the context of drug trafficking offenses.  *See, e.g.*, *United States v. Gell*, No. 96-42-P-H, 1999 WL 33117098 (D. Me. Apr. 8, 1999) (considering a 28 U.S.C. § 2255 motion on the grounds that the defendant was a minimal participant).  "[S]ection 3B1.2 focuses on the role of a defendant with respect to the offense(s) *of which he was convicted*."  *United States v. Neal*, 36 F.3d 1190, 1211 (1st Cir. 1994); *see also U.S. v. Coviello*, 225 F.3d 54, 67 (1st Cir. 2000) (stating that the defendant "must demonstrate that he was a minimal or minor participant in the conduct that formed the basis of his sentence.").  Here, as in *Coviello*, Mr. Daigle's sentence is based "on the single transaction" in which he engaged.  *Id.*

To receive the reduction, Mr. Daigle must be "both less culpable than most others involved in the offense of conviction and less culpable than most other miscreants convicted of comparable crimes."  *United States v. Melendez*, 301 F.3d 27, 33 (1st Cir. 2002) (quoting *United States v. Ortiz-Santiago*, 211 F.3d 146, 149 (1st Cir. 2000)).  Even assuming that Mr. Daigle is less culpable than the others involved in this conspiracy, it cannot be said that he is less culpable than others convicted of comparable crimes.  The money laundering scheme at issue in this case depended upon the willingness of a third party, not connected to drug dealing, to allow the use of his good name to hide and legitimize Mr. Pelletier's ill-gotten gains.  In this sense, Mr. Daigle's role in the offense was not minimal at all – it was essential.

If Mr. Pelletier had duped Mr. Daigle, it could be another matter.  The guidelines contemplate that a minimal participant reduction may be accorded to a person who has a "lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others."  U.S.S.G. § 3B1.2, Application Note 4.  But, even though Mr. Pelletier was never foolish enough to confirm that the source of the funds was illegal activity, Mr. Daigle admitted that he

18

believed Mr. Pelletier was using drug proceeds to purchase the property.  *Prosecution Version* at 3.

Mr. Daigle's suspicions were well-founded.  The Pelletier proposition was manifestly fishy.  Mr. Daigle had no direct connection at all with the real estate until he walked into Mr. Pelletier's attorney's office and put his name on the deed.  Mr. Pelletier, not Mr. Daigle, had all the dealings with the real estate agent, put down the $1,000.00 deposit, negotiated the purchase price, used his own attorney to prepare the paperwork and hold the closing, and he arrived outside the law office the day of the closing to hand Mr. Daigle the cash.  As if these circumstances were not enough to warn Mr. Daigle off, in the parking lot before the closing, Mr. Pelletier handed him a plastic shopping bag filled with $50,540.00 in cash to drop on the lawyer's desk and pay for the property.  Mr. Daigle made a conscious choice.  He resolved that the potential benefit – that he would become the owner of the property if Mr. Pelletier passed away – was worth the risk of his involvement in a scheme of palpably dubious legitimacy.

Mr. Daigle was not a minor participant under § 3B1.2.  *See United States v. Rivera-Rodriguez*, 318 F.3d 268, 278 (1st Cir. 2003) (refusing a § 3B1.2 downward adjustment where defendant participated in large cash transactions with another individual's drug transaction money and was one of the "prime sources" of the money laundering); *United States v. Manan*, 91 Fed. Appx. 732 (2nd Cir. 2004) (finding that courier who transported over one million dollars in illegal funds did not play a minor role in the context of a money laundering conspiracy, though his role may have been minor in the scheme of the larger drug conspiracy).

**D.    Right to Counsel with Respect to the March 17, 2000 Snowmobile Operation Conviction**

Finally, Mr. Daigle challenges one of the snowmobile operation convictions "as having been obtained in the absence of counsel or otherwise in violation of his constitutional right to

counsel."[10]   *Def.'s Mot.* at 2-3 n.2.   To determine whether a previous conviction should be included to calculate a defendant's criminal history category, "[o]nce the government establishes the existence of a prior conviction, the burden shifts to the defendant to show that the earlier conviction was constitutionally infirm or otherwise inappropriate for consideration."   *United States v. Barbour*, 393 F.3d 82, 93 (1st Cir. 2004).   Here, the Government established the existence of the conviction.   *PSR* ¶ 19; *see United States v. Gray*, 177 F.3d 86, 89 (1st Cir. 1999) (finding that the Government's "modest" burden was met by the presentence report).

The burden shifts to Mr. Daigle.   Silence alone does not meet this burden, as the Defendant is in the "best position to offer details about his own criminal history."   *Barbour*, 393 F.3d at 93.   Here, Mr. Daigle raises the issue without proffering any evidence that his constitutional rights were compromised.   Without further evidence, the Court will include Mr. Daigle's March 17, 2000 conviction, as described in the presentence report, in its criminal history calculations.

## III.   CONCLUSION

The Court concludes:

1.       Each of Mr. Daigle's two state of Maine convictions for operating a snowmobile under the influence will be attributed one point in the calculation of his criminal history;

2.       Mr. Daigle's violation of a condition of release will be attributed one point in the calculation of his criminal history;

3.       The 2007 Guidelines will apply to Mr. Daigle's sentencing;

4.       Mr. Daigle is not a minimal participant under U.S.S.G. § 3B1.2; and,

---

[10] Whether Mr. Daigle has two or three criminal history points, his criminal history category will remain the same – category II.

5.      Mr. Daigle has not sustained his burden of showing that his March 17, 2000 conviction for operation of a snowmobile under the influence was obtained unconstitutionally.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 3rd day of July, 2008